IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CLIFTON BELL,

          Plaintiff,

v.

METROPOLITAN ATLANTA RAPID
TRANSIT AUTHORITY, CHIEF WANDA
DUNHAM, Personally, ASSISTANT
CHIEF JOSEPH DORSEY,
Personally, and A, B, and C,
Being Those Persons, Firms, or
Entities Presently Unknown to
Plaintiff,

          Defendants.

CIVIL ACTION NO.

1:10-cv-1117-JEC

## ORDER AND OPINION

This case is before the Court on defendants' Motion for Summary Judgment [69] and plaintiff's Motion for Summary Judgment [75]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendants' motion [69] should be **GRANTED** and plaintiff's motion [75] should be **DENIED**.

## BACKGROUND

This is a § 1983 case arising out of plaintiff's employment with defendant Metropolitan Atlanta Rapid Transit Authority ("MARTA"). Plaintiff began working as a MARTA police officer in May, 2005. (Pl.'s Second Am. Compl. ("Compl.") [37] at ¶¶ 19-20.) In January,

2006, he became the Department Administrator for the MARTA police. (*Id.*) As Department Administrator, plaintiff was responsible for managing the daily administrative functions of the department, including overseeing the budget and processing purchase requisitions and expense reports. (Defs.' Statement of Mat. Facts ("DSMF") [69] at ¶ 4.)

During the relevant time period in his employment as Department Administrator, plaintiff was designated as having Level II authority. (*Id.* at ¶ 5 and Defs.' Mot. for Summ. J. [69] at Ex. B.) Level II Authority is "limited to approving documents for payment or financial processing." (*Id.*) Under the Level II designation, plaintiff was not authorized to enter into written agreements or open accounts on behalf of the MARTA police department without approval from his superiors. (First Interview Tr. [25] at Ex. K and Final Meeting Tr. [25] at Ex. F.)

Sometime in December, 2006, Lieutenant Christopher Heggs and Sergeant Daniel Jefferson approached plaintiff about making certain purchases at Best Buy. (Compl. [37] at ¶ 35.) At the time, the MARTA police department did not have an account with Best Buy. (Pl.'s Statement of Mat. Facts ("PSMF") [76] at ¶ 32.) After being given a packet of information by Heggs, plaintiff contacted a Best Buy representative and completed a "Best Buy Business Application"

(the "Application").   (Pl.'s Feb. 12 Statement [25] at Ex. K and Application [25] at Ex. J.)

In the Application, plaintiff indicated that he was creating a "Net" account.   (Application [25] at Ex. J.)   Plaintiff identified "MARTA Police" as the account holder and provided the physical and billing address of the police department, as well as the department's federal tax ID number. (*Id.*)   Plaintiff signed the Application on a signature line that appears immediately below the following statement:

> By the signature of its authorized representative below, the business entity: (1) submits an Application for a credit limit in the highest amount we deem appropriate, regardless of any initial sale amount; (2) represents that it has authorized the execution of the Application; (3) authorizes Bright Prospects Ltd. to check credit on both the business and owners and partners, if any; (4) represents that the information provided in this application is true and correct and understand[s] that any false information may result in cancellation of the Account; and (5) agrees to be bound by the terms and conditions of the Business Account Agreement which is attached.   Further, the individual signing below represents that he or she is authorized to execute this Application on behalf of its business entity.

(*Id.*)

The Application submitted by plaintiff generated Best Buy Account Number 7004-0191-0002-1832 (the "1832 Account").   (Best Buy Invoice Nos. 01040705506867 and 01040705506862 [25] at Ex. J.)   After

3

the Application was approved, Sergeant Jefferson purchased a number of items on the 1832 Account. (*Id.*)   Plaintiff received and processed the invoices associated with Jefferson's purchases in the course of performing his regular job duties. (*Id.*)

Around the same time, plaintiff provided Lieutenant Heggs with contact information for a Best Buy representative. (Jan. 8, 2007 Email [69] at Ex. C.)  Heggs subsequently completed a "Best Buy Government and Education Net – No Fee Application" (the "No Fee Application"). (No Fee Application [25] at Ex. I.)   In the No Fee Application, Heggs requested an unlimited credit line and listed plaintiff as the contact person. (*Id.*)   The No Fee Application submitted by Heggs generated Best Buy Account Number 7004-0191-0002-2350 (the "2350 Account").

On January 29, 2007, Heggs made several purchases on the 2350 Account. (Best Buy Invoice No. 01290705603295 [25] at Ex. J.) Approximately a week later, Jefferson became aware of those purchases when he checked the mailbox for MARTA's K-9 department and opened an invoice from Best Buy pertaining to the 2350 Account. (Jefferson's Feb. 14 Statement [37] at Ex. L.)  Jefferson informed plaintiff about the invoice. (*Id.*)   Plaintiff confirmed that Heggs had made the purchases, and processed the invoices on February 7, 2007. (Pl.'s Feb. 12 Statement [25] at Ex. J.)

4

The following day, Jefferson took a copy of the 2350 Account invoice to his supervisor Lieutenant Angela Smith. (Smith Statement [37] at Ex. L.)  Smith reported the incident to MARTA's Assistant Chief of Police Joseph Dorsey, who advised MARTA's Chief of Police Wanda Dunham about the situation. (*Id.*)  When confronted with the 2350 Account invoice, Heggs admitted that he had not followed proper procedure for making the purchases and offered his resignation. (*Id.*)  Dunham subsequently launched internal affairs investigations into the conduct of plaintiff and Heggs with respect to Best Buy. (AI 007-2007 [25] at Ex. J and AI 045-2007 [37] at Ex. L.)

The Heggs investigation was conducted by Sergeant S. Reynolds and Detective Miguel Albarron. (AI 045-2007 [37] at Ex. L.)  Their findings, including the fact that Heggs made numerous unauthorized purchases from Best Buy, are reflected in internal affairs report AI 045-2007. (*Id.*)  Although the AI 045-2007 report focuses on Heggs, it tangentially references plaintiff. (*Id.*)  For example, the report includes Albarron's conclusion that several unauthorized purchases had been made on plaintiff's MARTA-issued purchase card for dry-cleaning and a bluetooth headset bought at Best Buy, but later returned in exchange for a gift card.[1]  (*Id.*)  It also indicates that:

------

[1]  Plaintiff paid restitution to MARTA for these purchases in January, 2009. (Pl.'s Dep. [73] at 210-11.)

5

> [plaintiff] had opened up a Best Buy account in
> MARTA's name without authorization and that
> Heggs was making unauthorized purchases from
> this account.

(*Id.* at 4.)

Plaintiff's investigation was conducted by Lieutenant Kyle Jones. (AI 007-2007 [25] at Ex. J.) Pursuant to the investigation, Jones interviewed plaintiff on February 12, 2007. (*Id.*) Throughout the interview, plaintiff insisted that he did not set up an account with Best Buy or complete an application for an account. (First Interview Tr. [25] at Ex. K.) When pressed on the issue, plaintiff stated: "Well it wasn't an application but there was information put on a sheet of paper for them to obtain our information and I filled that out." (*Id.* at 2.) Upon further questioning, plaintiff reiterated that "this is not an account that was opened up" and "[a]ll I've done is provide information as far as an address and a name as to where the bill should be sent. That's it. That's all I did with Best Buy." (*Id.* at 4, 6.)

Near the end of his interview with Jones, plaintiff was instructed to retrieve a copy of the Application. (*Id.* at 30-31.) Confronted with language clearly indicating that the Application was designed to set up a Best Buy account, plaintiff continued to prevaricate. He explained that although "it might be set up as an account, . . . in my mind it wasn't set up as an account period."

6

(*Id.* at 36-37.)  He then suggested that Best Buy had "misrepresented themselves."  (*Id.* at 36.)  Ultimately, plaintiff adhered to his position that all he did was provide "billing information" to Best Buy.  (*Id.* at 31, 37.)

On March 1, 2007, Jones submitted the results of internal affairs investigation AI 007-2007 to Dunham.  (AI 007-2007 [25] at Ex. J.)  AI 007-2007 consists of:  (1) Jones' report, (2) three Best Buy invoices, (3) a copy of the Application and MARTA tax ID that plaintiff faxed to Best Buy, and (4) plaintiff's written statement.  (*Id.*)  In the report, Jones found that plaintiff knowingly made false statements during the investigation concerning his role in the Best Buy incident and that he sent written communications to a Best Buy representative without the required approval.  (*Id.*)  Based on those findings, Jones sustained charges against plaintiff for four violations of MARTA's General Order No. 26-101 pertaining to false or incomplete testimony and unauthorized written communications.  (*Id.*)

Defendants Dunham and Dorsey reviewed AI 007-2007 on the day that it was submitted.  (DSMF [69] at ¶ 63.)  The following day, Dunham prepared and signed a disciplinary action form recommending plaintiff's termination.  (Disciplinary Action Form [25] at Ex. B.) The form states that:

> On December 28, 2006, [plaintiff] opened up a
> Best Buy account on behalf of the MARTA Police
> Department without authorization from the Chief

> or her designee.  During the investigation he
> was less than truthful with the investigator as
> it related to his actions opening the account.

(*Id.*)  In addition, Dunham prepared a draft termination letter stating that plaintiff was charged with four violations of General Order 26-101, and indicating that plaintiff's effective termination date would be March 2, 2007.  (Draft Termination Letter [25] at Ex. B.)  The termination letter states that a name-clearing hearing on plaintiff's behalf will be scheduled the following week.[2]  (*Id.*)

Plaintiff met with Dorsey and Dunham the following Monday, March 5, 2007.  (Final Meeting Tr. [25] at Ex. F.)  During the meeting, the parties discussed the findings in AI 007-2007.  (*Id.*)  Plaintiff admitted that he did "not have the authority" to establish an account with Best Buy and he sought to explain that his intent was only to provide billing information.  (*Id.* at 6-8.)  Towards the end of the meeting, plaintiff acknowledged that "in hindsight [he] should not have filled out" the Application.  (*Id.* at 16.)  Nevertheless, Dunham advised plaintiff at the conclusion of the meeting that he had two options:  "Resign today or be terminated."  (*Id.* at 17.)  Plaintiff

---

[2]  A name-clearing hearing provides a terminated employee the "opportunity to put into the official record any information that they feel may serve to clear their name." (General Order 26-103 [69] at Ex. H.)  It is not an appeal of the termination and does not alter the employee's status in any way.  (*Id.*)

8

opted to resign in lieu of termination, and signed a prepared resignation letter. (Resignation Letter [25] at Ex. C.)

Following his resignation, plaintiff made a request under Georgia's Open Records Act for copies of his personnel file, internal affairs file, and field file. (Pl.'s Information Request [10] at Ex. G.) MARTA responded to plaintiff's Open Records Act request in January, 2008. (Compl. [37] at ¶ 116.) At that time, MARTA provided plaintiff a copy of his personnel file, AI 007-2007, the draft termination letter, and the disciplinary action form. (*Id.*)

In January, 2009, plaintiff requested that MARTA remove the draft termination letter and the disciplinary action form from his file. (Jan. 27, 2009 Letter to MARTA [10] at Ex. G.) According to plaintiff, those records were inconsistent with the fact that he had resigned, as opposed to being terminated. (*Id.*) MARTA responded to plaintiff that its records:

> clearly reflect that you resigned your employment with the MARTA Police Department. However, the resignation was in lieu of termination. An Internal Affairs investigation was conducted and charges were sustained against you that resulted in a termination decision by the Chief of Police.

(Jan. 27, 2009 Fax from MARTA [10] at Ex. H.)

Several months later, plaintiff again requested that MARTA remove the draft termination letter and disciplinary action form from his file and, for the first time, requested a name-clearing hearing.

9

(Mar. 10, 2009 Letter to MARTA [69] at Ex. K.)   Plaintiff also requested that he be reinstated with back-pay.  (*Id.*)  MARTA denied both requests, and reiterated its position that plaintiff's file accurately reflected a resignation in lieu of termination.  (Apr. 30, 2009 Letter [25] at Ex. D.)  MARTA stated further that, as a result of plaintiff's voluntary resignation, a name-clearing hearing was neither necessary nor required.  (*Id.*)

Plaintiff filed this action in April, 2010, asserting federal and state claims arising out of MARTA's maintenance of allegedly false and stigmatizing records.  (Original Compl. [1].)  Defendants moved to dismiss the action, and during the briefing of that motion plaintiff amended the complaint twice.  (Defs.' Mot. to Dismiss [11] and Pl.'s First Am. Compl. [21] and Second Am. Compl. [37].)  As amended, and following the Court's rulings on the motion to dismiss, plaintiff has four remaining federal causes of action:  (1) Counts I, II and III asserting claims under § 1983 for due process violations arising out of MARTA's publication of the draft termination letter, the disciplinary action form, AI 007-2007, and AI 045-2007 and (2) Count IV asserting a claim against MARTA for constructive discharge.[3] (Order [35] and Compl. [37] at ¶¶ 140-201.)  The parties have filed

---

[3]   In its previous order, the Court dismissed plaintiff's constructive discharge claim against defendants Dunham and Dorsey and stayed plaintiff's numerous state law claims.  (Order [35].)

cross motions for summary judgment on all of these claims.  (Defs.'
Mot. for Summ. J. [69] and Pl.'s Mot. for Summ. J. [75].)

**DISCUSSION**

I.   **SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when the pleadings, depositions,
answers to interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment as
a matter of law.  FED. R. CIV. P. 56(c).  A fact's materiality is
determined by the controlling substantive law.  *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue is genuine when the
evidence is such that a reasonable jury could return a verdict for
the nonmovant.  *Id.* at 249-50.

Summary judgment is not properly viewed as a device that the
trial court may, in its discretion, implement in lieu of a trial on
the merits.  Instead, Rule 56 of the Federal Rules of Civil Procedure
mandates the entry of summary judgment against a party who fails to
make a showing sufficient to establish the existence of every element
essential to that party's case on which that party will bear the
burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317,
322 (1986).  In such a situation, there can be no genuine issue as to
any material fact, as a complete failure of proof concerning an
essential element of the non-moving party's case necessarily renders

11

all other facts immaterial. *Id*. at 322-23 (quoting FED. R. CIV. P. 56(c)).

The movant bears the initial responsibility of asserting the basis for his motion. *Id*. at 323. However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the non[-]moving party's case." *Id*. at 325. After the movant has carried his burden, the non-moving party is then required to "go beyond the pleading[]" and present competent evidence designating "specific facts showing that there is a genuine issue for trial." *Id*. at 324. While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988), "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48 (1986)(emphasis omitted).

AO 72A
(Rev.8/82)

II.   **PLAINTIFF'S DUE PROCESS CLAIMS**

    A.   **Substantive Due Process**

In Count I of the complaint, plaintiff vaguely alleges that MARTA violated his substantive due process rights. (Compl. [37] at ¶ 141.)  There are no more specific allegations in the complaint, much less evidence in the record, to support a substantive due process claim.  *See McKinney v. Pate,* 20 F.3d 1550, 1556 (11th Cir. 1994)("[t]he substantive component of the Due Process Clause protects those rights that are 'fundamental,' that is, rights that are 'implicit in the concept of ordered liberty'")(quoting *Palko v. Connecticut,* 302 U.S. 319, 325 (1937)).  Accordingly, the Court **GRANTS** defendants' motion for summary judgment [69] and **DENIES** plaintiff's motion for summary judgment [75] to the extent that plaintiff intends to assert a substantive due process claim.

    B.   **Procedural Due Process**

The allegations in Counts I, II, and III of the complaint are more appropriately seen as asserting claims for procedural due process violations.  (Compl. [37] at ¶¶ 140-190.)  Specifically, plaintiff alleges that MARTA's maintenance of the Best Buy investigation records damaged his good name and reputation without affording him necessary procedural protections such as a name-clearing hearing.  (*Id.* at ¶ 142.)  As relief for the violation,

AO 72A
(Rev.8/82)

plaintiff requests damages, a name-clearing hearing, and removal of the records from MARTA's files. (*Id.* at 33, 35.)

Reputational damage sustained in connection with the termination of government employment can, under certain circumstances, give rise to a § 1983 procedural due process claim. *Cotton v. Jackson*, 216 F.3d 1328, 1330 (11th Cir. 2000). To recover under that theory, plaintiff must prove that: (1) a false statement, (2) of a stigmatizing nature, (3) attending his discharge, (4) was made public, (5) by his governmental employer, (6) without a meaningful opportunity for a name clearing hearing. *Id.* In this case, there is no evidence that defendants made a "false statement" in connection with plaintiff's "discharge" from MARTA. *Id.* Even assuming a procedural due process violation, plaintiff has not availed himself of available and adequate state remedies. Accordingly, the Court **GRANTS** defendants' motion for summary judgment [69] and **DENIES** plaintiff's motion for summary judgment [75] on Counts I, II and III.

  1. <u>Plaintiff was not discharged from his position.</u>

As an initial matter, the record clearly reflects that plaintiff was not discharged from his position at MARTA. Rather, he voluntarily resigned. When plaintiff was offered both options during his final meeting with Dunham and Dorsey on March 5, 2007, he

AO 72A
(Rev.8/82)

unequivocally chose resignation in lieu of termination.[4] (Resignation Letter [25] at Ex. C.)   In conjunction with his decision, plaintiff signed a letter stating: "Effective today, March 5, 2007, I resign my position . . . with the MARTA Police Department." (*Id.*)   MARTA subsequently confirmed in its correspondence with plaintiff that he "resigned . . . in lieu of termination." (Jan. 27, 2009 Fax from MARTA [10] at Ex. H.)

Absent any evidence to the contrary, the Court must presume that plaintiff's resignation was voluntary. *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995).   An employee's resignation can be deemed involuntary where it was obtained under coercion or by fraud or misrepresentation. *Id.* However, there is no evidence of coercion or fraud in this case.

In *Hargray*, the Eleventh Circuit lists several factors that can be helpful in determining whether an employee's resignation was obtained by coercion, including whether the employee:  (1) was offered an alternative to resignation and understood the nature of the choices presented, (2) had a reasonable time in which to choose, (3) was permitted to select the effective date of the resignation,

---

[4]  That plaintiff's personnel file contains a draft termination letter and a form recommending termination are of no consequence. Plaintiff concedes that, under the circumstances, it is customary for MARTA to prepare both resignation and termination letters.  (PSMF [76] at ¶ 76.)  Presented with both, it is undisputed that plaintiff elected to resign.  (Resignation Letter [25] at Ex. C.)

15

and (4) had the advice of counsel. *Id.* It is undisputed that defendants gave plaintiff an alternative to resignation. (Final Interview Tr. [25] at Ex. F.) That the alternative was not appealing to plaintiff does not mean that the resignation was coerced. (*Id.*)

Further, there is no evidence to suggest that plaintiff did not understand the nature of the available options. Defendants notified plaintiff of his rights at the beginning of the investigation and during his initial interview with Investigator Jones. (Administrative Inquiry Garrity Warning [25] at Ex. J and First Interview Tr. [25] at Ex. K.) At the conclusion of the interview, defendants put plaintiff on paid administrative leave and expressly warned him that the investigation could result in his termination. (Administrative Leave Notice [25] at Ex. J.) Plaintiff was given a copy of MARTA's general orders and his job required familiarity with those orders. (Pl.'s Dep. [73] at 37-39.) He knew or should have known that MARTA is only required to provide a name-clearing hearing for employees that are involuntarily terminated. (General Orders [69] at Ex. H.)

Plaintiff complains that he was not given a reasonable time to choose between the available options or an opportunity to seek the advice of counsel. (Pl.'s Resp. [80] at 20-21.) However, plaintiff did not ask for more time either to make his decision or to retain an attorney. In the two weeks between his initial interview with

16

Investigator Jones and his final meeting with Dunham and Dorsey, plaintiff had ample time to consider the various potential outcomes of the investigation.

Plaintiff also contends that he only "chose to resign to prevent the type of derogatory information from being placed in his files that are now included" in it. (Pl.'s Resp. [80] at 21.) But there is no evidence that defendants affirmatively led plaintiff to believe that the investigation records would be removed from MARTA's files or otherwise kept secret if plaintiff chose to resign. Plaintiff's own unfounded assumptions concerning MARTA's record keeping procedures are not evidence of coercion.

Neither is there any evidence to support plaintiff's claim that he was defrauded into resigning. According to plaintiff, defendants fraudulently concealed the fact that he had already been fired at the time of his resignation and failed to clarify for him the existence of two separate Best Buy accounts, one of which was created by Heggs. (Pl.'s Mot. for Summ. J. [70] at 37-39.) As an initial matter, the Court reiterates that there is no evidence to suggest that plaintiff had already been fired at the time of his resignation. Notably, plaintiff cites this non-existent misrepresentation as the "most deceiving fact" of all. (Pl.'s Resp. Defs.' Mot. Summ. J. [80] at 21.)

17

Defendants' failure to clarify for plaintiff that two Best Buy Accounts existed is also irrelevant.  As plaintiff well knew, and admitted on multiple occasions to both Investigator Jones and Dunham and Dorsey, he did not have the authority to establish *any* account on MARTA's behalf.  (First Interview Tr. [25] at Ex. K and Final Meeting Tr. [25] at Ex. F.)  Plaintiff's conduct with respect to the 1832 Account was sufficient to sustain the charges against him that directly resulted in his resignation.  Given that fact, the resignation could not be deemed to have been procured by the concealment of facts associated with the 2350 Account.

    2.   The statements cited in the complaint are not actionable.

Even assuming that plaintiff was discharged, there is no evidence that his termination was attended by any material false statements on the part of defendants.  In Count I of the complaint, plaintiff alleges that AI 007-2007, and the disciplinary action form and draft termination letter generated as a result of that investigation, contain false statements.  (Compl. [37] at ¶ 153.) That allegation is not supported by any evidence in the record.  On the contrary, the undisputed evidence confirms the accuracy of all the documents cited in the complaint.

The AI 007-2007 report concludes that plaintiff:

> knowingly made several false statements to the Internal Affairs Investigator: [1] he stated

18

> that he just provided Best Buy with an address
> to send an invoice to; [2] he stated that he did
> not fill out an application and [3] that he did
> not open an account with Best Buy . . . .
> Officer Bell admitted that [4] he sent written
> communications to a Best Buy representative
> without permission of the Chief or her designee.

(AI 007-2007 Report [25] at Ex. J.)  The disciplinary action form confirms that plaintiff "opened up a Best Buy account on behalf of the MARTA Police Department without authorization from the Chief or her designee" and that he "was less than truthful with the investigator" about his actions.  (Disciplinary Form [13] at Ex. B.) Based on those findings, the draft termination letter concludes that plaintiff violated General Order No. 26-101 and recommends termination.  (Draft Termination Letter [25] at Ex. B.)  Every one of the preceding statements is consistent with the documentary evidence in the record and plaintiff's own admissions.  (First Interview Tr. [25] at Ex. K and Final Meeting Tr. [25] at Ex. F.)

In Counts II and III of the complaint, plaintiff alleges several inaccuracies in the AI 045-2007 report that was generated by the Heggs investigation.  (Compl. [37] at ¶¶ 167, 181.)  Specifically, plaintiff takes issue with the statement in the report that:

> It was discovered that Bell . . . had opened up
> a Best Buy account in MARTA's name without
> authorization and that Heggs was making
> unauthorized purchases from this account.

19

(*Id.* at ¶ 167.)   Plaintiff also challenges the statement in a CD accompanying the AI 045-2007 report that plaintiff "made unauthorized purchases on his Marta issued purchase card."   (*Id.* at ¶ 181.)

Based on the evidence in the record, it is technically inaccurate to say that Heggs made unauthorized purchases from the particular Best Buy account that was opened by plaintiff.   But the inaccuracy is wholly immaterial to plaintiff's claims.   Again, plaintiff concedes that he was not authorized to establish *any* account on MARTA's behalf.   The charges that led to plaintiff's resignation were based on plaintiff's admitted failure to act within his authority, and his subsequent lack of candor about his actions. Which particular unauthorized account plaintiff established is irrelevant.   As to the statements on the accompanying CD, it was confirmed during the investigation that plaintiff had made unauthorized purchases on his MARTA purchase card, and plaintiff subsequently made restitution in the amount of $225.00 to MARTA for those purchases.   (Pl.'s Dep. at 210-11.)

In addition, it is clear from the record that the AI 045-2007 report was created in conjunction with Heggs' investigation and resignation.   To assert a procedural due process claim for reputational damage, a government employee must show that the alleged false statements were made in connection with his own termination. *See Cannon v. City of West Palm Beach*, 250 F.3d 1299, 1301 (11th Cir.

20

2001)(clarifying that stigmatizing information must be placed in a plaintiff's file "during the course of his discharge from employment."). AI 045-2007 and the accompanying CD were prepared in regard to *another employee*, who like plaintiff *voluntarily resigned*. (Smith Statement [37] at Ex. L.) As such, the statements cited in Counts II and III are not actionable by plaintiff.

    3. <u>There is an adequate state remedy.</u>

  Finally, plaintiff's due process claims cannot survive summary judgment because plaintiff has not shown that "the state refuse[d] to provide a process sufficient to remedy the procedural deprivation." *McKinney*, 20 F.3d at 1557. A state must be given the opportunity to remedy procedural failings "before being subjected to a claim alleging a procedural due process violation." *Cotton,* 216 F.3d at 1331. Thus, in order to prevail on his procedural due process claim, plaintiff must show that Georgia's courts could not have provided an adequate remedy for the alleged procedural deprivation. *McKinney*, 20 F.3d at 1564, n.20.

  In *Cotton*, the Eleventh Circuit held that the writ of mandamus is an available and adequate state remedy to protect the due process rights of a Georgia plaintiff alleging violations stemming from his termination in the absence of a name-clearing hearing. *Cotton*, 216 F.3d at 1332-33. The Georgia Supreme Court recently adopted the reasoning of *Cotton. Joiner v. Glenn*, 288 Ga. 208, 209-10 (2010).

21

The *Joiner* Court specifically held that "a writ of mandamus is a procedural remedy which cures defendants' failure to provide plaintiff with a name-clearing hearing." *Id.* at 210.   Applying *Cotton* and *Joiner*, plaintiff's failure to seek a writ of mandamus is fatal to his procedural due process claim.   For this additional reason, defendants are entitled to summary judgment on Counts I, II, and III of the complaint.

III. **PLAINTIFF'S CONSTRUCTIVE DISCHARGE CLAIM**

    In Count IV of the complaint, plaintiff asserts a constructive discharge claim as a stand-alone cause of action.   (Compl. [37] at ¶¶ 191-201.)  In its previous order, the Court noted that federal law does not support a stand-alone constructive discharge claim. (Order [35] at 17.)   The Court advised plaintiff that, although a constructive discharge may be actionable as part of a § 1983 claim, plaintiff would first have to allege that the discharge arose out of a violation of a constitutional right.   (*Id.*)   The Court then instructed the parties to focus their subsequent briefing on the legal gap in plaintiff's constructive discharge theory.   (*Id.*) Neither party has followed the Court's instructions.

    Nevertheless, there clearly is insufficient evidence in the record to create a material issue of fact as to whether plaintiff was constructively discharged.   In order to prevail on a constructive discharge claim, plaintiff must show that his work environment and

22

AO 72A
(Rev.8/82)

conditions of employment "'were so unbearable that a reasonable person . . . would be compelled to resign.'" *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009)(quoting *Virgo v. Riviera Beach Assocs., Ltd.,* 30 F.3d 1350, 1363 (11th Cir. 1994)). This is an onerous standard. *See Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1231 (11th Cir. 2001)(noting that a constructive discharge requires more than the "pervasive conduct" sufficient to show a hostile work environment).

Plaintiff does not present evidence to suggest pervasive conduct on the part of defendants, or any actions that might have rendered his working conditions "unbearable." *Bryant,* 575 F.3d at 1298. On the contrary, the record indicates that defendants conducted a thorough and timely investigation, ultimately sustaining charges against plaintiff based on his conduct during the investigation and his own admissions. The investigation lasted less than a month, and at its conclusion plaintiff was given the option to resign or be terminated. That set of facts is simply insufficient to prove a constructive discharge.[5]  *Id.  See also Van Der Meulen v. Brinker Int'l*, 153 Fed. App'x 649, 656 (11th Cir. 2005)("the standard of

---

[5]  Dunham and Dorsey's warnings during their final meeting with plaintiff that his conduct might have been criminal, or that MARTA's investigation was ongoing, are irrelevant.  (Final Meeting Tr. [25] at Ex. F.)  As a matter of law, "ominous warnings are insufficient to establish a constructive discharge in a § 1983 action."  *Slattery v. Neumann*, 200 F. Supp. 2d 1367, 1373 (S.D. Fla. 2002).

23

proof for a constructive discharge claim is higher than that for a hostile work environment claim").

Further, and as discussed above, there is no evidence to overcome the presumption that plaintiff voluntarily resigned from his position at MARTA.   Indeed, plaintiff concedes that he chose to resign because he hoped to keep the Best Buy incident private, not because his working conditions were intolerable.  (Pl.'s Resp. [80] at 21.)   The Court recognizes that, at the conclusion of the investigation, plaintiff had to choose between two undesirable options.  But the fact remains that plaintiff had a choice.  *See Hargray,* 57 F.3d at 1568 (plaintiff's constructive discharge claim failed where he had the choice to resign or "stand pat and fight"). Plaintiff's decision to resign precludes him from recovering on a constructive discharge theory.  *Id*.  Accordingly, the Court **GRANTS** defendants' motion for summary judgment [69] and **DENIES** plaintiff's motion for summary judgment [75] on plaintiff's constructive discharge claim.

## IV.   STATUTE OF LIMITATIONS

In addition to the grounds discussed above, summary judgment in favor of defendants is warranted under the applicable statute of limitations.   The parties agree that all of plaintiff's federal claims are subject to the two-year limitations period set forth in O.C.G.A. § 9-3-33.  *See Lovett v. Ray,* 327 F.3d 1181, 1182 (11th Cir.

24

2003)("'Federal courts apply their forum state's statute of limitations for personal injury actions to actions brought pursuant to 42 U.S.C. § 1983.'")(quoting *Uboh v. Reno,* 141 F.3d 1000, 1002 (11th Cir. 1998)). The limitations period begins to run when "'the facts which would support a cause of action are apparent or should be apparent to a person with a reasonably prudent regard for his rights.'" *Id.* (quoting *Rozar v. Mullis,* 85 F.3d 556, 561 (11th Cir. 1996)).

Plaintiff's due process claims are based on the theory that his reputation was injured as a result of MARTA's maintenance of the draft termination letter, the disciplinary action form, and the reports associated with AI 007-2007 and AI 045-2007 in his personnel files. (Compl. [37] at ¶¶ 141-190.) The publication of "stigmatizing information" pursuant to a state statute such as the Georgia Open Records Act is "sufficient . . . to implicate the liberty interest" of the due process clause. *Buxton v. City of Plant,* 871 F.2d 1037, 1046 (11th Cir. 1989). *See also Palmer v. Stewart Cnty. Sch. Dist.,* 178 Fed. App'x 999, 1004-05 (11th Cir. 2006)(holding same). Consequently, the material facts giving rise to a potential due process claim should have been apparent to plaintiff by January, 2008, when MARTA responded to his Open Records Act request. (Compl. [37] at ¶ 116.) Plaintiff filed this action in April, 2010, well outside of the limitations period.

25

Contrary to plaintiff's argument, the exclusion of the AI 045-2007 report from the Open Records production does not toll the statute of limitations. (Pl.'s Resp. [80] at 28-29.) The differences between the AI 045-2007 report and the AI 007-2007 report are immaterial as they pertain to the due process claims asserted by plaintiff. (AI 045-2007 [37] at Ex. L and AI 007-2007 [25] at Ex. J.) The reports contain the same allegedly stigmatizing information, and the factual basis of an actionable claim arising from AI 045-2007 would have been apparent to plaintiff as a result of the disclosure of AI 007-2007. (*Id.*) Indeed, AI 007-2007, along with the draft termination letter and the disciplinary action form, are the focus of the claims asserted in Counts I, II and III of the complaint. (Compl. [37] at ¶¶ 140-190.)

Neither is the statute tolled as a result of fraud on the part of defendants. In support of his fraud argument, plaintiff again contends that defendants concealed the fact that the 2350 Account was opened by Heggs. (Pl.'s Resp. [80] at 27-28.) According to plaintiff, he did not have the necessary information to uncover the fraudulent concealment until he obtained evidence concerning the 2350 Account from Best Buy in early 2009. (*Id.* and Pl.'s Reply [87] at 11.)

The extent of plaintiff's knowledge concerning the 2350 Account is open to debate. It is undisputed that plaintiff provided Heggs

with contact information for a Best Buy representative. (Jan. 8, 2007 Email [69] at Ex. C.) In addition, Investigator Jones pointed out to plaintiff during the initial interview that the Best Buy invoices under review were associated with two different account numbers. (First Interview Tr. [37] at Ex. N.) The AI 007-2007 report that was disclosed to plaintiff in January, 2008 also contains invoices associated with the 2350 Account. (AI 007-2007 [25] at Ex. J.)

More importantly, any information that plaintiff belatedly discovered about the 2350 Account is irrelevant to his due process claims. As stated in Counts I, II, and III of the complaint, plaintiff's claims arise out of MARTA's maintenance of allegedly stigmatizing records concerning the events surrounding plaintiff's resignation. (Compl. [37] at ¶¶ 140-190.) Based on the records, plaintiff was investigated and asked to resign because he opened an unauthorized account at Best Buy and was evasive about that fact in a subsequent internal affairs investigation. (AI 007-2007 [25] at Ex. J.) Ultimately, plaintiff conceded during the investigation both that he established the account and that he lacked the authority to do so. (Final Interview Tr. [25] at Ex. F.) That Heggs also opened an unauthorized Best Buy account has no bearing on the results of the investigation or the records generated by it.

27

Plaintiff also resurrects his argument that defendants concealed from him the fact that he was terminated on March 2, 2007. (Pl.'s Resp. [80] at 27-28.)  According to plaintiff, he did not become aware that he was terminated until January, 2009, when he received a letter from MARTA stating that:

> The records maintained by MARTA clearly reflect that you resigned your employment with the MARTA Police Department.  However, the resignation was in lieu of termination.   An Internal Affairs investigation was conducted and charges were sustained against you that resulted in a termination decision by the Chief of Police.

(Jan. 27, 2009 Letter [10] at Ex. H.)  By its plain terms, the letter cited by plaintiff does not reveal the previously concealed fact that plaintiff was terminated.  (*Id.*)  Rather, the letter confirms that plaintiff resigned from MARTA, in lieu of termination.  (*Id.*)

Plaintiff's constructive discharge claim is likewise barred by the statute of limitations.   A claim for constructive discharge arises when an employer "'deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job.'" *Bryant,* 575 F.3d at 1298 (quoting *Munday v. Waste Mgmt. of N. Am., Inc.,* 126 F.3d 239, 244 (4th Cir. 1997)).   Plaintiff would have necessarily been aware of any facts that made his working conditions "intolerable" at least by the time he resigned on March 5, 2007. Again, plaintiff did not file this action until April, 2010, over a year after the limitations period expired.

28

As is apparent from the above discussion, all of plaintiff's federal claims are barred by the applicable two-year statute of limitations.   Plaintiff does not make a plausible argument for tolling the statute either for his due process or his constructive discharge claims.   Accordingly, and for this additional reason, the Court **GRANTS** defendants' motion for summary judgment [69] and **DENIES** plaintiff's motion for summary judgment [75].

V.   **PLAINTIFF'S STATE LAW CLAIMS**

As all of plaintiff's federal claims have been removed from the case, § 1367(c)(3) applies.   That section states that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if the district court has dismissed all claims over which it has original jurisdiction."   28 U.S.C. § 1367(c)(3). The Supreme Court has observed that:

> a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims.   When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.

*Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988)(footnote omitted).   *See also Hardy v. Birmingham Bd. of Educ.*, 954 F.2d 1546, 1550 (11th Cir. 1992).

29

The Court concludes that dismissal of plaintiff's state law claims is appropriate in this case because plaintiff's federal claims have been dismissed. Moreover, "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966)(footnotes omitted). Accordingly, the Court **DISMISSES without prejudice** plaintiff's remaining state law claims.

<u>CONCLUSION</u>

For the foregoing reasons, the Court **GRANTS** defendants' Motion for Summary Judgment [69] and **DENIES** plaintiff's Motion for Summary Judgment [75]. The clerk is directed to **CLOSE** this case.


SO ORDERED, this <u>17th</u> day of SEPTEMBER, 2012.


/s/ Julie E. Carnes
JULIE E. CARNES
CHIEF UNITED STATES DISTRICT JUDGE

30